1 | ROBERT M. YASPAN, SBN 051867
JOSEPH G. McCarty, SBN 151020
2 | LAW OFFICES OF ROBERT M. YASPAN
3 | 21700 Oxnard Street, Suite 1750
Woodland Hills, California 91367
4 | Telephone: (818) 905-7711
Facsimile: (818) 501-7711
5 |
6 | [Proposed] General Bankruptcy Counsel for Debtor-in-Possession

7
8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

10

11 | In re                                    ) Chapter  No.:   11
12 |                                          )
    | Zulki Corporation                       ) Case No.:  8:13-bk-19586-MW
13 |                                          )
14 |                                          ) DEBTOR'S EMERGENCY MOTION FOR
    |                      Debtor             ) AUTHORITY TO: (A) USE CASH COLLATERAL
15 |                                          ) ON AN INTERIM BASIS PENDING A FINAL
    |                                          ) HEARING; (B) GRANT REPLACEMENT LIENS;
16 |                                          ) AND (C) SET FINAL HEARING;
17 |                                          ) MEMORANDUM OF POINTS AND
    |                                          ) AUTHORITIES; DECLARATION OF
18 |                                          ) ZULQARNAIN MUHAMMAD
    |                                          )
19 |                                          ) Date:  [To be set]
20 |                                          ) Time:
    |                                          ) Place:  Courtroom: 6C
21 |                                          )         411 West Fourth Street
    |                                          )         Santa Ana, California 92701
22 |                                          )
23 | _____)

24
25
26
27
28

1

**TO THE HONORABLE MARK WALLACE AND ALL INTERESTED PARTIES:**

Pursuant to Local Bankruptcy Rule 9075-1, General Order 02-02, and Section 363 of 11 USC § 101 *et seq.* (the "Bankruptcy Code"), Zulki Corporation, the herein Chapter 11 debtor and debtor in possession ("Debtor"), hereby files this emergency motion ("Emergency Motion") seeking authority to use cash collateral to pay the Debtor's ordinary and necessary expenses retroactive to the date of the filing as set forth in the budget ("Budget") attached as Exhibit "1" to the Declaration of Zulqarnain Muhammad ("Muhammad Dec.").

It is imperative that the Debtor obtain immediate Court authority to use cash collateral in order to avoid immediate and irreparable harm to the Debtor's business. Debtor owns and operates its business in a food court at the Brea Mall as Wetzel's Pretzel and Coldstone Creamery. Any cessation in Debtor's operations will have devastating consequences for its goodwill and continuing operations of its business.

The only secured claimant known to the Debtor at this time that appear to have an all-encompassing security interest in the cash collateral of the Debtor appear to be Wilshire Bancorp, Inc., successor-in-interest to Saehan Bank in the claimed sum of approximately $205,000.00.

Dated: December 17, 2013

LAW OFFICES OF ROBERT M. YASPAN

By_____
ROBERT M. YASPAN
JOSEPH G. McCARTY
[Proposed] Attorneys for Debtor-in-Possession

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

## MEMORANDUM OF POINTS AND AUTHORITIES

I.     JURISDICTION.................................................................... 3

II.    SUMMARY OF MOTION.................................................... 3

III.   THE FAIR MARKET VALUE OF THE CASH COLLATERAL IS LESS
       THAN THE AMOUNTS OF THE CLAIMS AGAINST IT ...................... 5

IV.    THE DEBTOR'S IMMEDIATE NEED FOR USE OF CASH COLLATERAL
       TO AVOID IMMEDIATE AND IRREPARABLE HARM TO THE
       DEBTOR'S BUSINESS ...................................................... 6

V.     THE BUDGET.................................................................... 7

VI.    DISCUSSION .................................................................. 8

       1.   The Debtor Should be Authorized to Use Cash Collateral to Operate,
            Maintain and Preserve its Business ......................................... 9

       2.   The Lender is Adequately Protected ......................................... 9

            a.   The Lender is Adequately Protected by the Continued Operations
                 of the Debtor's Business ............................................. 10

            b.   The Lender is Adequately Protected by a Replacement Lien Against
                 The Debtor's Assets ................................................. 11

VII.   INFORMATION REQUIRED BY LBR 4001-2 ................................. 11

VIII.  ADDITIONAL INFORMATION .............................................. 12

DECLARATION OF ZULQARNAIN MUHAMMAD .............................. 14

1

## TABLE OF AUTHORITIES

2

**Cases**

3

In re Connor, 808 F.2d 1393, (10th Cir. 1987) ...................................................... 10

4

5

In re Dynaco Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993) ................................ 9

6

In re McCombs Properties VI, Ltd., 88 B.R. 261, (Bankr. C.D. 1988) ......................... 10

7

In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984) .................................................. 9

8

In re Oak Glen R-Vee, 8 B.R. 213, (Bankr. C.D. Cal. 1981) .................................... 9

9

10

In re Stein, 19 B.R. 458, (Bankr. E.D. PA 1982) ................................................... 9

11

In re Triplett, 87 B.R. 25 (Bankr. W.D. Tex. 1988) ............................................... 10

12

Matter of Pursuit Athletic Footware, Inc., 193 B.R. 713 (Bankr. D. Del. 1996) .............. 11

13

United Savings Association v. Timbers of Inwood Forest Associates, 108 S. Ct. 626, (1988) 10

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Statutes**

11 U.S.C. §363 ............................................................................ 12

11 U.S.C. §363(a) .................................................................... 4,7,8,9

11 U.S.C. §363(c)(1) .................................................................... 8

11 U.S.C. §363(c)(2) .................................................................. 8,9

11 U.S.C. §363(c)(2)(A) ............................................................... 9

11 U.S.C. §363(c)(2)(B) ............................................................. 9

11 U.S.C. §363(e) .................................................................... 9

11 U.S.C. §1107(a) .................................................................. 8

28 U.S.C. §157 ...................................................................... 3

28 U.S.C. §157(b) ................................................................... 3

28 U.S.C. § 1334 .................................................................... 3

28 U.S.C. §1408 ................................................................... 3

28 U.S.C. §1409 .................................................................... 3

**Rules**

LBR 4001-2(b)(1) ................................................................... 11

LBR 4001-2(b)(2) ................................................................... 12

LBR 4001-2(b)(3) ................................................................... 12

LBR 4001-2(b)(4) ................................................................... 12

LBR 4001-2(b)(5) ................................................................... 12

LBR 4001-2(b)(6) ................................................................... 12

LBR 4001-2(b)(7) ................................................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### JURISDICTION

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.  Venue in this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

### II.
### SUMMARY OF MOTION

2.      On November 26, 2013 (the "Petition Date"), the Debtor commenced its reorganization by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Muhammad Dec. Paragraph 2.

3.      The Debtor is continuing in possession of its assets and is operating and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Muhammad Dec., Paragraph 3.

4.      The Debtor owns and operates its business in a food court at the Brea Mall as Wetzel's Pretzel and Coldstone Creamery located at 1065 Brea Mall, #2154, Brea, California 92821 ("Subject Business").  Muhammad Dec., paragraph 4.

5.      Debtor is in the position to make money, but needs to restructure its debt load.  The Debtor believes that under the Chapter 11 process, it will be able to accomplish this restructuring to enable the Debtor to preserve the value of its assets.  Muhammad Dec., Paragraph 4.

6.      On or about September 27, 2007, Debtor obtained a loan from Saehan Bank in the principal sum of $396,000 which is alleged to have been secured by certain assets of Debtor ("Loan"). A copy of the Commercial Security Agreement regarding the Loan is attached hereto as Exhibit "3". Debtor is informed that an UCC-1 Financing Statement was filed on or about October 4, 2007.  The

1    Loan has still has an outstanding balance of approximately $205,000. Debtor is informed and believes

2    that Wilshire Bancorp, Inc. is the successor-in-interest to Saehan Bank ("Lender"). Muhammad Dec.,

3    Paragraph 5.

4
            7.     Attached hereto as Exhibit "1" is a true and correct copy of Debtor's proposed budget.

5
6    The Debtor must be able to pay all such expenses to avoid immediate and irreparable harm. The Cash

7    Collateral Budget that is designed to allow the Debtor some operating maneuverability pending the

8    final hearing on this Motion.   A copy of the proposed order to be signed by the Court is attached to

9
10   the Muhammad Declaration as Exhibit "2".   Muhammad Dec., paragraph 6.

11          8.     In order for the Debtor to continue to operates the Subject Business, it is vital that it

12   continue to operate. Unless the Debtor is able to use the revenue generated by the Subject Business,

13   Debtor will not be able to continue to operate, generate more income, and preserve their value.   All of

14
     which would be disastrous and fatal to the Debtor's business operations. Muhammad Dec., paragraph
15
16   7.

17          9.     Pursuant to alleged security agreement by Lender,  the income generated by the Debtor

18   constitutes "cash collateral" within the meaning of 11 U.S.C. §363(a). While the Debtor hopes that it

19   will ultimately be able to reach a consensual agreement with the purported Lender on the use of cash

20
21   collateral (as it has been in negotiations with it), a cash collateral stipulation between the parties will

22   take time to negotiate, draft and put before the Court. Due to the Debtor's need for immediate use of

23   cash collateral, any formal stipulation, if any, with the purported secured creditors will have to occur

24   after the Debtor obtains interim use of cash collateral from the Court. Muhammad Dec., paragraph 8.

25         10.    The only continuing and substantial source of revenue available to the Debtor to

26
     operate the Subject Business is the revenue generated from its business operations. As a result,
27
28   Debtor has virtually no ability to continue to operate its business and maintain the going concern

1   value of its business unless the Debtor has immediate access to and use of its Cash Collateral to pay

2   the ordinary operating expenses.  The inability of the Debtor to use its Cash Collateral would likely

3   and very shortly result in the immediate closure of the Debtor's operations and liquidation of the

4   Debtor's assets, to the detriment of the all of the Debtor's creditors, including the alleged secured

5   claimant, which would receive only pennies on the dollar in a straight liquidation.  Therefore, the

6   Court should approve the Motion and authorize the Debtor to use cash collateral *nunc pro tunc* to the

7   Petition Date to operate, maintain and preserve its business.  Muhammad Dec., Paragraph 9.

8

### III.
#### THE FAIR MARKET VALUE OF THE CASH COLLATERAL
#### IS LESS THAN THE AMOUNTS OF THE CLAIMS AGAINST IT.

In order for the Debtor to maintain the Subject Business is vital that it continue to operate.

Unless the Debtor is able to use the revenue generated by the Subject Business, Debtor will not be

able to continue to operate, generate more income, and preserve their value.   All of which would be

disastrous and fatal to the Debtor's business operations.  Muhammad Dec., paragraph 10.

Pursuant to security agreement by Americas United Bank, it contends that the income

generated by the Debtor constitutes "cash collateral".  While the Debtor hopes that it will ultimately

be able to reach a consensual agreement with the purported secured claimants on the use of cash

collateral, a cash collateral stipulation between the parties will take time to negotiate, draft and put

before the Court.  Due to the Debtor's need for immediate use of cash collateral, any formal

stipulation, if any, with the purported secured creditors will have to occur after the Debtor obtains

interim use of cash collateral from the Court.  Muhammad Dec., Paragraph 8.

The only continuing and substantial source of revenue available to the Debtor to operate the

Subject Business is the revenue generated from its business operations.  As a result, Debtor has

virtually no ability to continue to operate its business and maintain the going concern value of its

business unless the Debtor has immediate access to and use of its Cash Collateral to pay the ordinary

operating expenses.  The inability of the Debtor to use its Cash Collateral would likely and very

shortly result in the immediate closure of the Debtor's operations and liquidation of the Debtor's

assets, to the detriment of the all of the Debtor's creditors, including the alleged secured claimant,

which would receive only pennies on the dollar in a straight liquidation.  Therefore, the Court should

approve the Motion and authorize the Debtor to use cash collateral *nunc pro tunc* to the Petition Date

to operate, maintain and preserve its business.  Muhammad Dec., Paragraph 9.

Debtor believes that the value of the inventory and equipment is $21,000.  Muhammad Dec.,

paragraph 11.

Since the fair market value of the claims against the personal property collateral by Lender is

in the range of $205,000, it is submitted that for purposes of this interim Order only that Lender is

partially secured and partially unsecured.  Muhammad Dec., paragraph 12.

## IV.
## THE DEBTOR'S IMMEDIATE NEED FOR USE OF CASH COLLATERAL TO AVOID IMMEDIATE AND IRREPARABLE HARM TO THE DEBTOR'S BUSINESS

The Debtor's alleged outstanding principal balance owed to Lender is believed to be

approximately $205,000.    While the Debtor has significant assets, due to financial conditions,

certain aspects of Debtor's business have stagnated which has strained the Debtor's liquidity.  The

Debtor is at a crucial point in restructuring its business, and any disruption in the Debtor's business,

thereby affecting the Debtor's ability to successfully reorganize.  In order for the Debtor to meet its

current obligation to its customers, continue the operation and preservation of the business, and

generate new business, the Debtor must be able to use the revenue generated by its business to pay

the expenses of its business.  Unless the Debtor is able to use the revenue generated by the business

to pay its ordinary and necessary operating expenses, the Debtor will not be able to fulfill its existing

1  and future obligations, or pay its employees, all of which would be disastrous and fatal to the

2  Debtor's business operations, cash flow and the jobs of the approximately 15 employees plus 2

3  employees in management who depend on Debtor for their livelihood.   Muhammad Dec., paragraph

4  13.

5

6  Pursuant to Debtor's agreements with Lender, the revenue generated by the Debtor's business

7  may also constitute the "cash collateral" within the meaning of 11 U.S.C. §363(a).  While the Debtor

8  hopes that it will ultimately be able to reach a consensual agreement with the alleged secured

9  creditors on the use of cash collateral, a cash collateral stipulation between the parties will take time

10  to negotiate, draft and put before the Court.  Due to the Debtor's need for immediate use of cash

11  collateral, any formal stipulation, if any, with the lenders will have to occur after the Debtor obtains

12  interim use of cash collateral from the Court.  Muhammad Dec., paragraph 8.

13

14  **V.**
**THE BUDGET**

15

16  In connection with the commencement of this case, the Debtor's officers carefully scrutinized

17  the Debtor's business operation and its requirements associated therewith.

18  As set forth in the budget ("the Budget"), a true and correct copy of which is attached to the

19  Muhammad Dec. as Exhibit "1", the Debtor will be able to operate with an estimated positive cash

20  flow post-petition.  The Budget sets forth the minimum requirements of the Debtor to operate its

21  business to accomplish a successful reorganization for all creditors.  The Budget does not

22  contemplate any "extraordinary" or "luxury" expense for which the Debtor will obtain prior written

23  consent from the Lender or order of this Court.  The Budget therefore contains the Debtor's basic

24  requirements for operations and it is reasonable.  Muhammad Dec., Paragraph 14.

25  Although the Budget represents the Debtor's best estimate of the necessary expenses

26  associated with the business, as the ebbs and flows of Debtor's business are unpredictable, the needs

27

28

7

of the business may fluctuate. Therefore, the Debtor requests Court authority to deviate from the total expenses contained in the Budget by no more than 15% on a line by line basis, and to deviate by category (provided the Debtor does not pay any expenses outside any of the approved categories) without the need for further Court order. Muhammad Dec., paragraph 15.

In order for the Debtor to operate its business in accordance with the Budget, the Debtor must be able to use the revenues which are paid directly to the Debtor. Muhammad Dec., paragraph 16.

**VI.**
**DISCUSSION**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. 11 U.S.C. §363(c)(1) provides in pertinent part:

> "If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of the property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. See, 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

(A)    each entity that has an interest in such cash collateral consents; or

(B)    the Court, after notice and a hearing, authorizes each use, sale or lease in accordance with the provisions of this section.

8

1  See, 11 U.S.C. §363(c)(2)(A) and (B).

2     Further, upon the request of an entity that has an interest in property proposed to be used by

3  the Debtor, the Court shall prohibit or condition such use "as is necessary to provide adequate

4  protection of such interest." 11 U.S.C. §363(e).

5

6     1.     The Debtor Should be Authorized to Use Cash Collateral to Operate, Maintain and
             Preserve its Business

7

8     It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for a

9  reasonable period of time for the purpose of maintaining and operating its property.  11 U.S.C.

10 §363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981).  In addition, where

11 the Debtor is operating a business, it is extremely important that the access to cash collateral be

12 allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabiliate

13

14 debtors and generally access to cash collateral is necessary to operate a business." In re Dynaco

15 Corporation, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459 (Bankr. E.D.

16 PA 1982).

17    Debtor has determined that it would clearly be in the overwhelming best interests of its estate

18 and its creditors and employees to continue to operate and maintain its business going concern.

19 (Muhammad Dec., paragraph 17)  The Court should authorize the Debtor to use cash collateral to

20

21 continue to operate and maintain its business because the interests of the Lender will be adequately

22 protected.

23    2.     The Lender is Adequately Protected

24

25    To the extent that an entity has a valid security interest in the revenues generated by property,

26 those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  Pursuant to

27 Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the

28 secured creditor is adequately protected.   In re Mellor, 734 F.2d 1396, 1400 (9th Cir. 1984).  See

1   also, In re Connor, 808 F.2d 1393, 1398 (10ᵗʰ Cir. 1987); In re McCombs Properties VI, Ltd., 88 B.R.

2   261, 265 (Bankr. C.D. 1988) ("McCombs").

3        Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

4
    Forest Associates, 108 S. Ct. 626, 629 (1988) ("Timbers") and subsequent case law, the property
5

6   interest that a debtor must adequately protect pursuant to Section 363(c)(1) and (2) of the Bankruptcy

7   Code is only the value of the lien that secures the creditor's claim.  108 S.Ct at 630.  See also,

8
    McCombs, Id. at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured
9
    creditor's claim) to the lessor of the [allowed amount of the] claim or the value of the collateral."
10

11  McCombs, Id at 266.

12       a.      **The Lender is Adequately Protected by the Continued Operations of the**
                 **Debtor's Business**
13

14       The preservation of the value of a secured creditor's lien is sufficient to provide adequate

15  protection to a secured creditor when a debtor seeks to use cash collateral.  In re Triplett, 87 B.R. 25

16  (Bankr. W.D. Tex. 1988).  See also, In re Stein, 19 B.R. 458 (Bankr. E.D. 1982).  In Stein, the Court

17
    found that, as a general rule, a debtor may use cash collateral where such use would enhance or
18
    preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though
19

20  the secured party had no equity cushion for protection.  The Stein Court determined that the use of

21  cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured

22  position could only be enhanced by the continued operations of the debtor's business.  See also,

23
    McCombs, supra, where the Court determined that the debtor's use of cash collateral for needed
24

25  repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest

26  in the cash collateral and such use would more likely increase cash collateral.

27       The Debtor has already reduced and will continue with its efforts to reduce further its

28
    operating expenses as much as possible.  Furthermore, the Debtor generates in excess of $650,000

                                        10

annually in revenue based upon its sales – funds which would not be available to Lender if the

Debtor ceased operating.   Muhammad Dec., paragraph 18.   In the case of <u>Matter of Pursuit Athletic</u>

<u>Footware, Inc.</u>, 193 B.R. 713 (Bankr. D. Del. 1996), the Court, accepting the debtor's argument that

no additional adequate protection payments need be made, held as follows:

> "if there is no actual diminution in the value of the [the] collateral through the date of the hearing, and [Debtor] can operate profitably post-petition, [creditor] is adequately protected for the use of its cash collateral.  (cites omitted)."

The only way for the Debtor to maximize its going concern value and to avoid a complete

shutdown of the Debtor's business, which would be absolutely decimating for the Debtor's creditors,

customers and employees, is for the Debtor to continue to continue to operate its business seamlessly.

Muhammad Dec., paragraph 19.

  **b.**   **The Lender is Adequately Protected by a Replacement Lien Against the Debtor's Assets**

To provide the Lender with further adequate protection for the Debtor's use of cash collateral,

the Debtor proposes to: (a) utilize the Budget attached as Exhibit "1" to the Muhammad Dec. with a

15% line by line variance potential; and (b) provide Lender with a replacement lien against the

Debtor's post-petition assets with the same extent, validity, priority, and scope as Lender had with its

liens against Debtor's pre-petition assets.

## VII.
## INFORMATION REQUIRED BY LBR 4001-2

Pursuant to Local Bankruptcy Rule 4001-2 the Debtor informs the Court whether or not there

exists a provision in the Stipulation relating to any or all of the following local bankruptcy rules:

1.   LBR 4001-2(b)(1) – Other than replacement liens, there is no such provision in which

Lender will be protected in the post-petition assets of the Debtor in the case of a decline in the value

of Lender's pre-petition collateral.

2.      LBR 4001-2(b)(2) – There is no such provision that binds the estate with respect to the validity, perfection or amount of the secured creditor's prepetition lien or debt or waives claims against the secured creditor.

3.      LBR 4001-2(b)(3) – There is no a provision for a limitation of the estate's rights under 11 U.S.C. Section 506(c).

4.      LBR 4001-2(b)(4) – There is no such provision.

5.      LBR 4001-2(b)(5) – There is no such provision.

6.      LBR 4001-2(b)(6) – There is no such provision, primarily because there is no creditor's committee.

7.      LBR 4001-2(b)(7) – There is no such provision.

## VIII.
## ADDITIONAL INFORMATION

This Emergency Motion is based on Section 363 of the Bankruptcy Code, this Emergency Motion, the supporting Memorandum of Points and Authorities, the Declaration of Zulqarnain Muhammad, an owner of the Debtor, the arguments and statements of counsel to be made at the hearing on the Emergency Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Emergency Motion, concurrently with the filing of this Motion, the Debtor served a copy of the Notice of this Emergency Motion, the Emergency Motion and all supporting documents via mail upon the Office of the Trustee ("OUST"), the Debtor's Secured Creditors, and each of the Debtor's twenty largest unsecured creditors. If an e-mail address was known, service was also made by e-mail.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order:

1.      Authorizing the Debtor to use cash collateral to pay all expenses set forth in the Budget;

12

2.      Granting the Lender a Replacement Lien as is provided in Part VI(2)(b) above;

3.      Scheduling a final hearing on the Debtor's Motion or cash collateral stipulation; and

4.      Granting such other and further relief as the Court deems just and proper under the circumstances of this case.

Dated: December 16, 2013                              LAW OFFICES OF ROBERT M. YASPAN

By_____
ROBERT M. YASPAN
JOSEPH G. McCARTY
[Proposed] Attorneys for Debtor-in-Possession

# DECLARATION OF ZULQARNAIN MUHAMMAD

I, Zulqarnain Muhammad, being first duly sworn, declare and allege as follows:

1.    I am an officer and a shareholder of Zulki Corporation, the debtor and debtor-in-possession in the above-captioned bankruptcy ("Debtor") in the above-captioned bankruptcy.  I have personal knowledge of the facts set forth herein and if called as a witness I could, and would, so competently testify hereto.

2.    On November 26, 2013 (the "Petition Date"), the Debtor commenced its reorganization by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.    The Debtor is continuing in possession of its assets and is operating and managing its business as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.    The Debtor owns and operates its business in a food court at the Brea Mall a Wetzel's Pretzel and Coldstone Creamery located at 1065 Brea Mall, #2154, Brea, California 92821 ("Subject Business").  Debtor is in the position to make money, but needs to restructure its debt load.  The Debtor believes that under the Chapter 11 process, it will be able to accomplish this restructuring to enable the Debtor to preserve the value of its assets.  Muhammad Dec., Paragraph 4.

5.    On or about September 27, 2007, Debtor obtained a loan from Saehan Bank in the principal sum of $396,000 which is alleged to have been secured by certain assets of Debtor ("Loan").  A copy of the Commercial Security Agreement regarding the Loan is attached hereto as Exhibit "3".  Debtor is informed that an UCC-1 Financing Statement was filed on or about October 4, 2007.  The Loan has still has an outstanding balance of approximately $205,000.  Debtor is informed and believes that Wilshire Bancorp, Inc. is the successor-in-interest to Saehan Bank ("Lender").

6.    Attached hereto as Exhibit "1" is a true and correct copy of Debtor's proposed budget.

1  The Debtor must be able to pay all such expenses to avoid immediate and irreparable harm.  The Cash

2  Collateral Budget that is designed to allow the Debtor some operating maneuverability pending the

3  final hearing on this Motion.   A copy of the proposed order to be signed by the Court is attached

4  hereto as Exhibit "2".

5

6          7.       In order for the Debtor to continue to operate the Subject Business, it is vital that it

7  continue to operate.  Unless the Debtor is able to use the revenue generated by the Subject Business,

8  Debtor will not be able to continue to operate, generate more income, and preserve their value.   All of

9  which would be disastrous and fatal to the Debtor's business operations.

10

11         8.       While the Debtor hopes that it will ultimately be able to reach a consensual agreement

12  with the purported secured claimant on the use of cash collateral, a cash collateral stipulation between

13  the parties will take time to negotiate, draft and put before the Court.  Due to the Debtor's need for

14  immediate use of cash collateral, any formal stipulation, if any, with the purported secured creditors

15  will have to occur after the Debtor obtains interim use of cash collateral from the Court.

16

17         9.       The only continuing and substantial source of revenue available to the Debtor to

18  operate the Subject Business is the revenue generated from its business operations.  As a result,

19  Debtor has virtually no ability to continue to operate its business and maintain the going concern

20  value of its business unless the Debtor has immediate access to and use of its Cash Collateral to pay

21  the ordinary operating expenses.  The inability of the Debtor to use its Cash Collateral would likely

22  and very shortly result in the immediate closure of the Debtor's operations and liquidation of the

23  Debtor's assets, to the detriment of the all of the Debtor's creditors, including the alleged secured

24  claimant, which would receive only pennies on the dollar in a straight liquidation.  Therefore, the

25  Court should approve the Motion and authorize the Debtor to use cash collateral *nunc pro tunc* to the

26  Petition Date to operate, maintain and preserve its business.

27

28

10.     In order for the Debtor to maintain the Subject Business is vital that it continue to operate. Unless the Debtor is able to use the revenue generated by the Subject Business, Debtor will not be able to continue to operate, generate more income, and preserve their value. All of which would be disastrous and fatal to the Debtor's business operations.

11.     Debtor believes that the value of the inventory and equipment is $21,000.

12.     Since the fair market value of the claims against the personal property collateral by Lender is in the range of $205,000, it is submitted that for purposes of this interim Order only that Lender is partially secured and partially unsecured.

13.     The Debtor's alleged outstanding principal balance owed to Lender is believed to be approximately $205,000.   While the Debtor has significant assets, due to financial conditions, certain aspects of Debtor's business have stagnated which has strained the Debtor's liquidity. The Debtor is at a crucial point in restructuring its business, and any disruption in the Debtor's business, thereby affecting the Debtor's ability to successfully reorganize. In order for the Debtor to meet its current obligation to its customers, continue the operation and preservation of the business, and generate new business, the Debtor must be able to use the revenue generated by its business to pay the expenses of its business. Unless the Debtor is able to use the revenue generated by the business to pay its ordinary and necessary operating expenses, the Debtor will not be able to fulfill its existing and future obligations, or pay its employees, all of which would be disastrous and fatal to the Debtor's business operations, cash flow and the jobs of the approximately 15 employees plus 2 employees in management who depend on Debtor for their livelihood.

14.     As set forth in the budget, attached hereto as Exhibit "1" ("Budget"), the Debtor will be able to operate with an estimated positive cash flow post-petition. The Budget sets forth the minimum requirements of the Debtor to operate its business to accomplish a successful

reorganization for all creditors. The Budget does not contemplate any "extraordinary" or "luxury"

expense for which the Debtor will obtain prior written consent from the Lender or order of this Court.

The Budget therefore contains the Debtor's basic requirements for operations and it is reasonable.

15.     Although the Budget represents the Debtor's best estimate of the necessary expenses

associated with the business, as the ebbs and flows of Debtor's business are unpredictable, the needs

of the business may fluctuate. Therefore, the Debtor requests Court authority to deviate from the

total expenses contained in the Budget by no more than 15% on a line by line basis, and to deviate by

category (provided the Debtor does not pay any expenses outside any of the approved categories)

without the need for further Court order.

16.     In order for the Debtor to operate its business in accordance with the Budget, the

Debtor must be able to use the revenues which are paid directly to the Debtor.

17.     Debtor has determined that it would clearly be in the overwhelming best interests of

its estate and its creditors and employees to continue to operate and maintain its business going

concern.

18.     Debtor has already reduced and will continue with its efforts to reduce further its

operating expenses as much as possible. Furthermore, Debtor generates in excess of $650,000

annually in revenue based upon its sales – funds which would not be available to Lender if the

Debtor ceased operating.

19.     The only way for Debtor to maximize its going concern value and to avoid a complete

shutdown of its business, which would be absolutely decimating for the Debtor's creditors,

///

///

///

17

customers and employees, is for the Debtor to continue to continue to operate its business seamlessly.

Executed at Brea, California this 16th day of December 2013.

I declare under penalty of perjury that the preceding is true and correct under the laws of the United States of America and State of California.

Zulqarnain Muhammad

# EXHIBIT 1

Zulki Corp 6 Month Projection - Dec 2013, Jan 2014 thru May 2014
DBA Wetzel's Pretzels/ColdStone Creamery

| | Dec | Jan | Feb | March | April | May |
|---|---|---|---|---|---|---|
| Sales | 81,514 | 47,954 | 58,482 | 51,669 | 64,139 | 59,274 |
| Cost Of Goods Sold: | | | | | | |
| Food Cost | 14,131 | 16,658 | 9,697 | 9,199 | 12,668 | 14,681 |
| Total Cost of Goods Sold: | 14,131 | 16,658 | 9,697 | 9,199 | 12,688 | 14,681 |
| Gross Margin: | 67,383 | 31,296 | 48,785 | 42,470 | 51,451 | 45,593 |
| Labor: | | | | | | |
| Manager | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Payroll | 9,729 | 9,511 | 7,545 | 7,227 | 10,650 | 7,487 |
| Total Labor | 10,729 | 10,511 | 8,545 | 8,227 | 11,650 | 8,487 |
| Operating Expenses: | | | | | | |
| Supplies | 88 | 70 | 123 | 90 | 80 | 85 |
| Telephone | 324 | 195 | 239 | 219 | 217 | 218 |
| Advertising/Marketing | 350 | 600 | 750 | 750 | 600 | 600 |
| Repair/Maintenance/Service | 7,348 | 3,301 | 2,133 | 3,196 | 1,721 | 2,952 |
| Utilities | 65 | 67 | 73 | 57 | 65 | 65 |
| Taxes and Insurance | 9,543 | 6,002 | 7,756 | 4,173 | 7,851 | 7,014 |
| Bank and Credit Card Fees | 1,124 | 2,033 | 1,391 | 1,232 | 1,385 | 1,320 |
| Royalties | 4,301 | 3,756 | 4,344 | 4,950 | 5,898 | 4,781 |
| Attorney Carve-out | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Rent | 16,602 | 16,601 | 16,601 | 16,601 | 17,014 | 16,614 |
| Saehan Bank | 1,709 | 1,709 | 1,709 | 1,709 | 1,709 | 1,709 |
| Total Operating Expenses: | 42,453 | 35,334 | 36,119 | 33,977 | 37,540 | 36,358 |
| Net Income: | 14,201 | (-14549) | 4,121 | 266 | 2,261 | (-252) |

# EXHIBIT 2

1  ROBERT M. YASPAN, SBN 051867
   JOSEPH G. McCarty, SBN 151020
2  LAW OFFICES OF ROBERT M. YASPAN
   21700 Oxnard Street, Suite 1750
3  Woodland Hills, California 91367
   Telephone: (818) 905-7711
4  Facsimile: (818) 501-7711
5
6  [Proposed] General Bankruptcy Counsel for Debtor-in-Possession
7
8                  **UNITED STATES BANKRUPTCY COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**
10
11 In re                                )  Chapter No.:  11
12                                       )
   Zulki Corporation                     )  Case No.:  8:13-bk-19586-MW
13                                       )
14                                       )  [PROPOSED] ORDER ON DEBTOR'S
                                         )  EMERGENCY MOTION FOR
15                            Debtor      )  AUTHORITY TO: (A) USE CASH COLLATERAL
                                         )  ON AN INTERIM BASIS PENDING A FINAL
16                                       )  HEARING; (B) GRANT REPLACEMENT LIENS;
                                         )  AND (C) SET FINAL HEARING;
17                                       )  MEMORANDUM OF POINTS AND
                                         )  AUTHORITIES; DECLARATION OF
18                                       )  ZULQARNAIN MUHAMMAD
                                         )
19                                       )
20                                       )  Date:  [To be set]
                                         )  Time:
21                                       )  Place:  Courtroom: 6C
                                         )          411 West Fourth Street
22                                       )          Santa Ana, California 92701
                                         )
23                                       )
                                         )
24 _____ )
25
26
27
28

                                    1

1    A hearing was held on December ____, 2013 at ____ a.m./p.m. in front of the Honorable

2    Mark Wallace1, United States Bankruptcy Judge for the Central District of California, in Courtroom

3    6C of the Courthouse located at 411 West Fourth Street, Santa Ana, California 92701, for the Court

4
5    to consider the emergency motion (the "Motion") filed by Zulki Corporation, the Chapter 11 debtor

6    and debtor in possession here (the "Debtor"), for entry of an order to: (A) use cash collateral on an

7    interim basis pending a final hearing; (B) grant replacement liens; and (C) set a final hearing.

8
     Appearances were made as set forth on the record of this Court.

9
         The Court, having considered the Motion and all papers filed by the Debtor in support of the
10
11   Motion, and the oral arguments and statements of counsel made at the hearing on the Motion, and

12   proper notice of the Motion and the hearing on the Motion having been provided, and finding that it

13   is essential to the continued operation of the Debtor and to the process of reorganization that the

14   Motion be granted; and further finding that pursuant to Bankruptcy Rule 4001 that such relief is
15
     necessary to avoid immediate and irreparable harm to the Debtor, and good cause appearing
16
17   therefore, hereby orders as follows:

18       1.      The Motion is granted nunc pro tunc to the Petition date upon the terms and

19   conditions set forth in this Order.

20       2.      The Court finds that it is essential to the continued operation of the Debtor and to the
21
     process of reorganization that the Motion be granted.  The Court further finds pursuant to Bankruptcy
22
23   Rule 6003 that such relief is necessary to avoid immediate and irreparable harm to the Debtor.

24       3.      The Debtor is authorized to use cash collateral to pay all of the expenses set forth in

25   the Budget attached to the Motion as Exhibit "A" for the interim period through
26
     _____, or such other later date as may be agreed upon in writing by the Debtor's
27
28

2

alleged secured creditor, Wilshire Bancorp, Inc., successor-in-interest to Saehan Bank ("Lender"), or as ordered by the Court (the "Budgeted Period").

4.     The Debtor is authorized to deviate from the total expenses contained in the Budget for the Budgeted Period by no more than 15%, on a line by line basis, and to deviate by category (provided the Debtor does not pay any expenses outside any of the approved categories) without the need for further Court order.

5.     As additional adequate protection of Lender's  interest in the cash collateral and the Debtor's use of the same during the Budgeted Period, Secured Creditors are hereby granted a replacement lien upon all postpetition assets of the Debtor's estate (except any "Avoidance Actions" arising under Section 544, 545, 546, 547, 548, 549, 550 or any similar provision of the Bankruptcy Code) to the extent of the Debtor's use of cash collateral during the Budgeted Period, with such replacement liens(s) to have the same extent, validity and priority as the Lender's lien upon the Debtor's pre-petition assets.

6.     The final hearing on the Motion shall be held on _____, 2014 at _____ a.m./p.m.

7.     The Debtor shall provide notice of the final hearing on the Motion upon all creditors, the Office of the United States Trustee, and those parties who have requested special notice.

**IT IS SO ORDERED**.

                                                      ###

Dated: _____

                                      _____
                                      HONORABLE MARK S. WALLACE
                                      UNITED STATES BANKRUPTCY JUDGE

3

# EXHIBIT 3

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $396,000.00 | 09-27-2007 | 06-27-2013 | 313217 | 40 / 52 & 54 | 33477 | KU | MU |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * * " has been omitted due to text length limitations.

**Grantor:**   ZULKI CORPORATION
1065 BREA MALL #2154
BREA, CA 92821

**Lender:**   Saehan Bank
Fullerton Office
4542 Beach Blvd.,
Buena Park, CA 90621

---

**THIS COMMERCIAL SECURITY AGREEMENT** dated September 27, 2007, is made and executed between ZULKI CORPORATION ("Grantor") and Saehan Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

| Loan No: 313217 | Page 3 |
|---|---|

coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's or any Grantor's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 313217

Page 4

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: 313217                                                                                                                Page 5

---

services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means ZULKI CORPORATION and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means ZULKI CORPORATION.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means Saehan Bank, its successors and assigns.

**Note.** The word "Note" means the Note executed by ZULKI CORPORATION in the principal amount of $396,000.00 dated September 27, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED SEPTEMBER 27, 2007.

GRANTOR:

ZULKI CORPORATION

By: _____
    ZULQARNAIN MUHAMMAD, President & Secretary
    of ZULKI CORPORATION

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Phone: (800) 331-3282 Fax: (818) 662-4141

**B. SEND ACKNOWLEDGEMENT TO: (Name and Address)**

UCC Direct Services
P.O. Box 29071
Glendale, CA 91209-9071

12327331

CA, Secretary of State

UCC Direct Services
Representation of filing

This filing is Completed
File Number : 077131640524
File Date : 04-OCT-2007

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION NAME | | | |
|---|---|---|---|
| ZULKI CORPORATION | | | |

| OR | 1b. INDIVIDUAL LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1065 BREA MALL #2154 | BREA | CA | 92821 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION CA | 1g. ORGANIZATIONAL ID#, if any CC2988328 ☐ NONE |
|---|---|---|---|---|

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION NAME | | | |
|---|---|---|---|
| WETZEL'S PRETZELS/COLD STONE CREAMERY | | | |

| OR | 2b. INDIVIDUAL LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1065 BREA MALL #2154 | BREA | CA | 92821 | USA |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION DBA | 2f. JURISDICTION OF ORGANIZATION CA | 2g. ORGANIZATIONAL ID#, if any ☒ NONE |
|---|---|---|---|---|

**3. SECURED PARTY'S (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P)** - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION NAME | | | |
|---|---|---|---|
| Saehan Bank | | | |

| OR | 3b. INDIVIDUAL LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4542 Beach Blvd. | Buena Park | CA | 90621 | USA |

**4. This FINANCING STATEMENT covers the following collateral**

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

**5. ALTERNATE DESIGNATION [if applicable]:** ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS   Attach Addendum [if applicable] | Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]   [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

| 8. OPTIONAL FILER REFERENCE DATA   '13217 | | JHL |
|---|---|---|
| 28298961 | | |

FILING OFFICE COPY - UCC FINANCING STATEMENT (FORM UCC1)   (REV. 05/22/02)

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

CT Lien Solutions
Representation of filing

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Phone:  Fax:

This filing is Completed
File Number : 1273139796
File Date : 18-MAY-2012

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Not Required          33307052

CALI

5130 -
File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 077131640524  10/4/2007  SS CA | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☒ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

| ☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b and also item 7c; also complete items 7e-7g (if applicable). |
|---|---|---|

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE): check only one box.**
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Saehan Bank | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 10. OPTIONAL FILER REFERENCE DATA | | | |
|---|---|---|---|
| 33307052 | Debtor Name: ZULKI CORPORATION 313217 (SAD) | JHL | |

FILING OFFICE COPY - UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

Prepared by CT Lien Solutions [3.23.0]

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21700 Oxnard Street, Suite 1750, Woodland Hills, CA 91367

A true and correct copy of the foregoing document entitled (*specify*): DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO: (A) USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (B) GRANT REPLACEMENT LIENS;  AND (C) SET FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ZULQARNAIN MUHAMMAD  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 18, 2013, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Michael J Hauser**    michael.hauser@usdoj.gov
- **William W Kim**    william@parkandlim.com
- **Ronald M Tucker**    rtucker@simon.com,
  cmartin@simon.com;psummers@simon.com;Bankruptcy@simon.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Robert M Yaspan**    court@yaspanlaw.com, tmenachian@yaspanlaw.com

**2. SERVED BY UNITED STATES MAIL**:
On          , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Please see attached service list.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on December 18, 2013I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

<u>All entities served via federal express overnight service.</u>

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/18/2013 | Tatyana Menachian | /s/ Tatyana Menachian |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**

**U.S. Trustee**
United States Trustee (SA)
411 W Fourth St., Suite 9041
Santa Ana, CA 92701-4593

Chamber Copy
Honorable Mark S. Wallace
United States Bankruptcy Court
411 West Fourth Street,
Suite 6135 / Courtroom 6C
Santa Ana, CA 92701-4593

Zulki Corporation
50 Hawk Hill
Mission Viejo, CA 92692

Saehan Bank
3580 Wilshire Blvd., Suite 600,
Los Angeles, CA. 90010

The Retail Property Trust
M.S. Management Association Inc.
225 West Washington Street
Indianapolis, Indiana 46204-3438

Coldstone Creamery
Kahala Holdings, LLC
9311 East Via De Ventura
Scottsdale, AZ. 85258

Wetzel's Pretzels
35 Hugus Alley, Suite 300
Pasadena, CA. 91103

Law Offices of Thomas F Nowland
4600 Campus Drive, First Floor.
Newport Beach, CA. 92660

Sysco Food
20701 East Currier Rd.
Walnut, CA. 91789

Roma
16639 Gale Ave.,
City of Industry, CA. 91745

Bank of America
2727 S. 48th St
AZ1-650-01-01
Tempe, AZ 85282-3143

Coverall
Orange County Support Center
625 The City Drive, Suite 110
Orange, CA 92868

Pepsi-Cola
27442 Portola Pkwy, Foothill
Ranch, CA 92610

Edward Don & Company
2562 Paysphere Circle
Chicago, IL 60674

AT&T
c/o Bankruptcy
1801 Valley View Ln
Farmers Branch, TX 75234

Orkin, LLC
2170 Piedmont Rd., NE
Atlanta, GA 30324

California Department of Food and
Agriculture
1220 N Street
Sacramento, California, 95814

ARAMARK Headquarters Office
1101 Market St
Philadelphia, PA 19107

PrimePay SoCal
11130 SW Barbur Blvd. Ste 200
Portland, OR. 97219

Capital One Commercial
Capital One Financial Corporation
Bankruptcy Notice Dept.
1680 Capital One Drive
McLean, VA 22102

OC Health Care
Hall of Administration
333 W. Santa Ana Blvd.
Santa Ana, CA 92701

*Request for Special Notice*
Simon Property Group, Inc.
Attn: Ronald M. Tucker, Esq.
225 West Washington Street
Indianapolis, Indiana 46204

Attorneys for Saehan Bank
William W. Kim, Esq.
PARK & LIM
3530 Wilshire Blvd.
Suite 1300
Los Angeles, CA 90010